**BLANK ROME LLP**
*A Pennsylvania LLP*
STEPHEN M. ORLOFSKY (NJ ID
012431974)
LEIGH ANN BUZIAK (NJ ID 035052004)
New Jersey Resident Partners
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Phone: (609) 750-2646
Fax: (609) 897-7286
Stephen.Orlofsky@BlankRome.com
LeighAnn.Buziak@BlankRome.com

*Attorneys for Plaintiffs*

**BLANK ROME LLP**
*A Pennsylvania LLP*
ANTHONY B. HALLER (*pro hac vice
forthcoming*)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5690
Anthony.Haller@BlankRome.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS, INC. and JANSSEN GLOBAL SERVICES, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> ANDREW BRACKBILL, <br><br> *Defendant*. | Civil Action No. _____ <br><br><br> ***Electronically Filed*** <br><br> **COMPLAINT** |

Plaintiffs Johnson & Johnson Health Care Systems, Inc. ("JJHCS") and

Janssen Global Services, LLC ("JGS") (collectively, "Plaintiffs") hereby file this

1

Complaint against Defendant Andrew Brackbill ("Brackbill" or "Defendant"), and allege as follows:

## NATURE OF THE ACTION

1.      This case involves egregious violations of legal and contractual obligations by Brackbill, a former employee of JJHCS and JGS.

2.      Before he resigned from JJHCS to join Pfizer, a major competitor of Plaintiffs, Brackbill misappropriated vast amounts of highly confidential information by clandestinely and maliciously downloading over a thousand files onto external storage devices.

3.      The information Brackbill had access to as an employee of JJHCS and JGS, which he took surreptitiously and without authorization in violation of the law, his contractual commitments, and company policy, relates directly to his job responsibilities at Pfizer.  Brackbill has accessed this information while working for Pfizer.

4.      Pfizer directly competes with Johnson & Johnson's business sector that focuses on various innovative medicine therapeutic areas, including oncology.

5.      Brackbill initially concealed that he planned to work for Plaintiffs' direct competitor, Pfizer.  He then admitted that he was going to work for Pfizer, but he misleadingly represented that his responsibilities at Pfizer would not involve a competitive overlap.

6.     Three weeks before he left JJHCS, with knowledge of his true intended role with Pfizer, Brackbill secretly downloaded more than a thousand of Plaintiffs' files containing competitively valuable and extremely sensitive confidential information from his company laptop to a personal external storage device, intermixed with files containing personal information and photographs seemingly so Brackbill could avoid detection and claim he was taking only personal information.

7.     Plaintiffs learned about Brackbill's downloading from an alert that was generated showing a large number of files had been downloaded. When interviewed by Plaintiffs about the alert, Brackbill initially claimed that he only took personal information. Plaintiffs' investigation has proven Brackbill's representation to be false. Not only did Brackbill misappropriate massive amounts of highly confidential information, but he accessed the stolen confidential and trade secret information during his employment with Pfizer.

8.     Plaintiffs have now learned through disclosures by Pfizer that, contrary to his representations to Plaintiffs, Brackbill has been, and remains, employed in a directly competitive role with Pfizer in which the confidential information he had access to (and stole) could advantage Pfizer and disadvantage Plaintiffs in direct violation of his post-employment contractual obligations.

9.     Plaintiffs seek immediate injunctive relief to ensure Brackbill's compliance with his post-employment obligations, and to protect against the

imminent and inevitable risk that Plaintiffs' confidential, proprietary, and trade secret information will be used or disclosed.

## THE PARTIES

10.     Johnson & Johnson Health Care Systems, Inc. is a New Jersey corporation with a principal place of business in Raritan, New Jersey.  It is a wholly-owned subsidiary of Johnson & Johnson. JJHCS is therefore a "COMPANY" as that term is defined in Brackbill's 2014 Noncompetition Agreement (as defined herein) and is an express third-party beneficiary under the 2014 Noncompetition Agreement. JJHCS is also a member of the "Corporation Group" as that term is defined in Brackbill's 2020 Noncompetition Agreement (as defined herein) and is an express third-party beneficiary under the 2020 Noncompetition Agreement.

11.     Janssen Global Services, LLC ("JGS") is a New Jersey limited liability company with its principal place of business in Raritan, New Jersey.  Its sole member is Janssen Pharmaceuticals, Inc., a New Jersey corporation with its principal place of business in New Jersey, which, is in turn a wholly owned subsidiary of Johnson & Johnson.  JGS is a "COMPANY" as that term is defined in Brackbill's 2014 Noncompetition Agreement (as described herein). JGS is also a member of the "Corporation Group" as that term is defined in Brackbill's 2020 Noncompetition Agreement (as defined herein) and is an express third-party beneficiary under the 2020 Noncompetition Agreement.

4

12.     Defendant Andrew Brackbill is a citizen of Pennsylvania; his home is located in Doylestown, Pennsylvania.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  This is an action between parties of diverse citizenship with an amount in controversy that exceeds $75,000, exclusive of interest and costs.

14.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C § 1836 *et seq.*  This Court has supplemental jurisdiction over the state law claims asserted herein because they are related to, arise from the same nucleus of operative facts, and are part of the same case or controversy as Plaintiffs' federal claim.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the parties consented to exclusive jurisdiction in this Court for the purposes of any litigation brought against a party to the Global Restricted Share Unit Award Agreement dated February 10, 2020, which contains the 2020 Noncompetition Agreement and to permissive jurisdiction under the 2014 Noncompetition Agreement.

## FACTUAL BACKGROUND

### I.   J&J'S BUSINESS RELIES ON HIGHLY CONFIDENTIAL AND PROPRIETARY AND TRADE SECRET INFORMATION

16.    Johnson & Johnson is a holding company, and its subsidiaries, including Plaintiffs, are engaged in the research and development, manufacture and sale of a broad range of products in the healthcare field.  Johnson & Johnson has two business sectors, one sector focused on various innovative medicine therapeutic areas (for the purposes of this pleading, such business sector shall be referred to as "J&J") and another sector focused on MedTech.  J&J is focused on the following therapeutic areas: Immunology (*e.g.*, rheumatoid arthritis, psoriatic arthritis, inflammatory bowel disease and psoriasis), Neuroscience (*e.g.*, mood disorders, neurodegenerative disorders and schizophrenia), Oncology (*e.g.*, prostate cancer, hematologic malignancies, lung cancer and bladder cancer), Cardiovascular and Metabolism (*e.g.*, thrombosis, diabetes and macular degeneration), and Pulmonary Hypertension (*e.g.*, Pulmonary Arterial Hypertension).

17.    J&J's medicines are distributed directly to retailers, wholesalers, distributors, hospitals, and healthcare professionals for prescription use.

18.    J&J's key products in its Oncology therapeutic area include, among others, medicines for the treatment of patients with prostate cancer (including ZYTIGA,  ERLEADA, and AKEEGA), lymphoma, multiple myeloma, and other

blood cancers (including IMBRUVICA and DARZALEX), and bladder cancer (urothelial cancer) (including BALVERSA and TAR-200, which is not yet on the market). Key products in its Cardiovascular therapeutic area include, among others, XARELTO, an oral anticoagulant. Key products in its Pulmonary Hypertension therapeutic area include, among others, OPSUMIT and UPTRAVI.

19.     J&J faces substantial competition in all of its geographic markets. J&J's business competes with companies of all sizes on the basis of cost-effectiveness, technological innovations, intellectual property rights, product performance, real or perceived product advantages, pricing and availability, and rate of reimbursement.   The competitive environment requires substantial investments in continuing research and development.

20.     With the intense competition in the industry, the protection of confidential, proprietary, and trade secret information is vital to protect J&J's investment in product and competitive commercial strategies, and to prevent competitors or would-be competitors from obtaining an unfair competitive advantage.

21.     J&J protects its business relationships and confidential information by, among other things, requiring employees, as a condition of employment, to agree not to disclose confidential or proprietary information, and to ensure the return of any such information at the termination of their employment.

22.    In exchange for executing these agreements, J&J promises to provide and does provide its employees with access to its valuable confidential and trade secret information on a need-to-know basis, training, and related goodwill. Specifically, J&J provides internal specialized training to its employees about its products and processes across the J&J portfolio.

23.    J&J also protects its trade secret and confidential information by storing information in physically secure buildings with security guards, where employees and visitors must sign in to access the building.  Employees must also have a functioning key card, issued and authorized by J&J, to gain access to J&J's offices.

24.    In addition to physical security measures, J&J also protects information stored electronically in a variety of ways.  J&J requires users to have company issued logins with passwords to log in to J&J's systems.  Immediately upon logging in, J&J employees are warned that they are about to gain access to J&J's confidential information, and reminded of their obligations to keep J&J internal information confidential. J&J protects its internal communications and internal documents by affixing legends and labels indicating the documents contain confidential information, for example: "FOR INTERNAL USE ONLY. Do not duplicate, modify, distribute, or use this item with parties external to [J&J]."

25.     In addition to the above measures, J&J has programs in place designed to detect the theft and exfiltration of confidential information and intellectual property.

## II.   BRACKBILL'S CAREER WITH PLAINTIFFS INVOLVED EXTENSIVE ACCESS TO J&J's CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION

26.     Over the course of his twenty-four (24) year career with companies within the Johnson & Johnson Family of Companies, including JJHCS and JGS, Defendant Andrew Brackbill worked in various roles in which he was privy to JJHCS and JGS's confidential and trade secret information.

27.     In 1999, Brackbill began his career within the Johnson & Johnson Family of Companies in finance until November 2007, when he started working in a pricing strategy role.  He was promoted to the position of Director of U.S. Pricing Strategy for Oncology, where he worked on J&J's growing oncology portfolio brands in all phases of product lifecycle including pre-launch planning stage as well as key management initiatives across franchises and sectors.

28.     In December 2014, Brackbill was promoted to Director of Global Pricing Strategy for Oncology in JGS's global commercial strategy organization ("GCSO"), where he led the development and execution of pricing and access strategies for key products such as ZYTIGA and ERLEADA in its Solid Tumor portfolio, and established launch pricing strategies for two of the most successful

oral oncology launches in history.  In this role, he led all aspects of global launch and lifecycle price targets and supporting strategies and presented and approved to senior management pricing strategies for products such as ERLEADA.  He was responsible for portfolio-level analytics, and he had access to global pricing strategies relating to international reference pricing and most-favored nation pricing.

29.     In July 2021, Brackbill changed positions and started working in J&J's Strategic Customer Group ("SCG") as Director of Trade Channel Strategy.  The SCG is a center of excellence dedicated to market access.  It is responsible for creating and formulating the competitive strategies for J&J's products through their lifecycle to ensure vital medicines are available to patients and their providers that need them in a cost-effective manner.  This includes strategies for establishing distribution channels, pricing, strategic account management, and contracting across J&J's portfolio.  The SCG further evaluates these strategies in the context of the highly competitive and complex healthcare system.

30.     The SCG generates information that, by definition, provides J&J with a competitive advantage through the insights, analysis, and plans that it creates based on its market research.  Indeed, the success or failure of any product against the competition may hinge on J&J's ability to successfully launch the product in the right distribution channel with the right pricing to effectively engage the payors within the healthcare system.

10

31.    In his role as Director of Trade Channel Strategy, Brackbill's responsibilities extended beyond responsibility for pricing, and included developing strategy for opening appropriate distribution channels based on the product J&J is bringing to market, including designing distribution, dispensing, and other key stakeholder networks to ensure key market capabilities and patient access are enabled for launch.    In this role, among other responsibilities detailed below, Brackbill supported new indication launches and strategy assessments in Cardiovascular and Oncology medicine for products such as ERLEADA.

32.    Brackbill's role within the SCG required extensive work with his colleagues in other groups within the SCG for many cross-functional initiatives that included other SCG capabilities such as Value and Access Pricing (VAP) and Strategic Contracting.  In fact, Brackbill needed to have access to information about VAP and strategic contracting to perform his job responsibilities.   Among other work that Brackbill performed in this role, he:

    a.  delivered channel strategies and delivery model design, using the Channel Strategy Playbook, including distribution and dispensing strategies to support launch and in-market strategies for J&J products;

    b.  collaborated within the SCG and with other key stakeholders to develop a plan and strategic distribution position for the future portfolio, including research, analysis, and conclusions showing the value of J&J's distribution network across its portfolio and options for strategic changes, including contract terms;

c. developed new product and new indication launch assessments and strategies for Oncology and Cardiovascular products and executed on pre-launch planning;

d. developed robust capabilities for inventory in the specialty pharmacy marketplace for Oncology products and other limited dispensing distribution networks; and

e. identified ideal channel partners and emerging distribution models (*i.e.*, the specialty pharmacy marketplace) to support J&J's products, including buy and bill capabilities and total regimen coordination.

33. To perform his job responsibilities as Director of Trade Channel Strategy, Brackbill had access to Plaintiffs' confidential, trade secret, and proprietary information across the J&J portfolio.

34. To make critical market access decisions such as the timing, budget, and execution for a proposed distribution channel design, Brackbill had to rely on, among other things, highly sensitive and confidential product sales data, customer lists, channel lists, contracting strategies, pricing models, market research, sales forecasts, launch playbooks, and strategy plans for products. Brackbill had access to internal dashboards and databases, *i.e.*, Tableau, from which he could pull highly confidential internal customer sales and order information to support his research and analysis for the SCG.

35. In his role in SCG, Brackbill also had access to high-level research and development initiatives undertaken by the SCG to aid in strategic business planning. As just one example, SCG performed a market access and policy assessment, which

is a valuable and high-level document that summarizes J&J's market research into various market and policy factors that affect its business, and is a document that Brackbill accessed during his employment with Pfizer as detailed below. In this assessment, which was the result of a substantial investment of time and resources, the SCG worked to identify and define market and policy factors that J&J believes will impact its business, and determined how J&J will integrate such factors and considerations into its strategic planning process and policy decision-making.

36. Each page of the assessment contains the legend: "FOR INTERNAL USE ONLY" with the additional instruction: "Do not duplicate, modify, distribute or use this item with parties external to [J&J]." On the third page of the assessment, before any substantive content is provided, there is a bold-titled "**DISCLAIMER**", with a number of bulleted items, after which the page closes with the following sentence in bold in the middle of the page: **This is for INTERNAL USE ONLY**.

37. In his role with SCG, Brackbill also had access to highly confidential business plans, known as Market Access Readiness Reviews (MARRs). SCG expends substantial time and resources developing these Reviews as a uniform business planning strategy process for J&J products across the portfolio. These business plans reflect the unique market access strategy for each product, and are supported by all of the data and market research that helps J&J define the value of its products. These formal business plans are regularly reviewed and updated. J&J

13

substantially invests in its uniform business planning efforts, and these strategies contain a substantial amount of specific, actionable, and directly competitive valuable information.

38.     In 2023, the SCG prepared a MARR for a product that competes directly with Pfizer, ERLEADA, which is a document that Brackbill accessed during his employment with Pfizer as detailed below. The cover page contains the legend: **"Subject to Legal, HCC, and Regulatory Review & Approval. Company Proprietary Information is not to be shared or distributed beyond the original distribution.** FOR INTERNAL USE ONLY. Do not duplicate, modify, distribute, or use this item with parties external to [J&J]."  Each page of the MARR thereafter contains one or both of these sentences.

39.     Brackbill was also directly involved with and had responsibility for the SCG's strategic assessments of its distributor relationships. J&J undertakes comprehensive assessments of its distributor networks, and it evaluates the competitive advantages that its distributor networks provide, as well as developing a comprehensive approach to the negotiation of its valuable distributor contracts. Information concerning these assessments is based on J&J's detailed analysis of data relating to those relationships, including the costs and value of such relationships, as well as external market research.  These efforts have major implications for J&J's

overall strategic planning efforts because they bring together all areas of market access, including pricing, distribution, contracting, and channel strategy.

40.     Around the time of his departure in 2023, Brackbill was working on one of these critical assessments.  He was preparing an update for J&J leadership on a review of these assessments, to discuss the key findings of the assessments, and to determine J&J's approach to its valuable distributor relationships. Brackbill took and accessed this document during his employment with Pfizer as detailed below.  Each page of the assessment contains the legend: "FOR INTERNAL USE ONLY. Do not duplicate, modify, distribute, or use this item with parties external to [J&J]."

41.     To support its business initiatives, the SCG relies on internal data that J&J has compiled from various sources.  This data is stored in various databases that are available to SCG group members, including Brackbill.  One of the ways to access this data is through a business intelligence and analytics software called Tableau, through which massive amounts of data can be pulled into reports to facilitate further research and analysis.  Two of the reports within the Tableau system are called "Channel Bar" and "Downstream Customers."

42.     SCG's data, analysis, conclusions and strategy recommendations, including the types of information described above, are highly confidential and, if disclosed, would reveal J&J's competitive and innovative product strategies, business planning processes and methodologies.

### III.   BRACKBILL'S OBLIGATIONS TO PLAINTIFFS

39.   In or around November 3, 2014, as a condition of his employment with JGS, as well as his access to JGS's confidential, proprietary, and trade secret information, Brackbill entered into the Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement with Plaintiff JGS (the "2014 Noncompetition Agreement"), attached here as **Exhibit A**.

40.   In the 2014 Noncompetition Agreement, Brackbill acknowledged that, during his employment, he "will be given access to CONFIDENTIAL INFORMATION [ ], will develop, maintain or enhance business and/or customer relationship and receive training relating to the business of [JGS], and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies." Ex. A, preamble.

41.   In the 2014 Noncompetition Agreement, CONFIDENTIAL INFORMATION is defined as:

> information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to [Brackbill] or known by [Brackbill] as a result of [his] employment by the COMPANY. CONFIDENTIAL INFORMATION includes, but is not limited to, (a) such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or

clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to [him] or known by [him] in connection with [his] employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings.

*Id.* ¶ B.

42.     In the 2014 Noncompetition Agreement, COMPANY is defined as:

individually and/or collectively Janssen Global Services, LLC, Johnson &Johnson, and all other entities within the Johnson & Johnson Family of Companies, and their respective successors and assigns.  An entity is within the Johnson & Johnson Family of Companies if it is at least 50 percent owned by Johnson & Johnson, either directly or indirectly.

*Id.*

43.     The 2014 Noncompetition Agreement continued to apply after Brackbill left his role at JGS, because it expressly "applies to any position that [Brackbill] may hold as an employee of the COMPANY and shall continue in effect in the event of a promotion, demotion, retention by a different EMPLOYER or in a new position, or any other change in the circumstances of his employer, including without limitation any change in the scope or nature of [his] responsibilities or assignment, [his] level or seniority, or [his] compensation or benefits." *Id.* ¶ C.15.

17

44.    Brackbill also acknowledged that his

EMPLOYER and/or the COMPANY have a legitimate interest in protecting its CONFIDENTIAL INFORMATION, its customer relationships and the goodwill associated with such customer relationships, and the provision to [Brackbill] of specialized training. [He] further acknowledged that the restrictive covenants contained in [the 2014 Noncompetition] Agreement are reasonably necessary to ensure [his] EMPLOYER or the COMPANY is able to protect its legitimate interests and, therefore, [Brackbill agrees] not to, in any action, suit or other proceeding, deny the reasonableness of, or assert the unreasonableness of, the restrictive covenants and he waived any such defense. In addition, [Brackbill agrees] that the restrictive covenants in [the 2014 Noncompetition] Agreement are separate and independent obligations and, therefore, the failure or alleged failure of the COMPANY to perform any obligations owed to you shall not constitute a defense to the enforceability of such restrictive covenants.

*Id.* ¶ C.12.

45.    Brackbill further acknowledged that

if [he violates] or is about to violate [the 2014 Noncompetition] Agreement, immediate irreparable injury to [his] EMPLOYER and the COMPANY will result, warranting (in addition to any other relief) the imposition of injunctive relief against you without the necessity of posting any bond.

*Id.* ¶ C.12.  And if he breaches "any of the provisions of this Agreement, the duration

of any applicable restrictive covenant shall commence from the date injunctive relief

is granted or from the date that you cease such conduct that violates the restrictive

covenant and shall be extended for an amount of time equivalent to any period of

breach." *Id.* ¶ C.13.

46.    The 2014 Noncompetition Agreement states that "[d]uring [his] employment with any COMPANY and for a period of eighteen (18) months after the termination of [his] employment (whether voluntary or involuntary), [he] will not, directly or indirectly, perform, or assist others to perform, work for any COMPETITOR in any position and in any location in which [he] could disadvantage any COMPANY or advantage the COMPETITOR by: (a) [his] disclosure or use of CONFIDENTIAL INFORMATION to which [he] had access; (b) [his] use of the specialized training provided to [him] by [his] EMPLOYER or any COMPANY for which [he] [has] worked; and/or (c) [his] use of CUSTOMER relationships and goodwill." Ex. A, ¶ C.6.

47.    During his employment, Brackbill received several award agreements under Johnson & Johnson's long-term incentive plan, include three awards that contain post-employment restrictions on competition: the February 10, 2020 Global Restricted Share Unit Award Agreement (the "2020 LTI Agreement"), the February 11, 2019 Global Nonqualified Stock Option Award Agreement (the "2019 LTI Agreement"), and the February 12, 2018 Global Nonqualified Stock Option Award Agreement (the "2018 LTI Agreement") (collectively, the "LTI Agreements"). The 2020 LTI Agreement is attached as **Exhibit B**, the 2019 LTI Agreement is attached as **Exhibit C**, and the 2018 LTI Agreement is attached as **Exhibit D**.

48.     Each of the LTI Agreements contain a restriction on post-employment competition similar to the 2014 Noncompetition Agreement:

> For a period of eighteen (18) months following [his] Date of Termination, [Brackbill] will not, without the prior written consent of the Corporation, directly or indirectly person, or assist others to perform, work for a Competitor in a position or in any geographic location in which [he] could disadvantage the Corporation Group[1] or advantage the Competitor through (a) [his] disclosure or use of the Corporation Group's confidential or trade secret information and/or (b) [his] use of the Corporation Group's Customer relationships and goodwill.

(the identical noncompete terms from the 2018, 2019, and 2020 LTI Agreements shall be referred to collectively as the "2020 Noncompetition Agreement").  *See* Ex B, ¶ 2(d)(ii); Ex. C, ¶ 2(b)(ii), Ex. D, ¶ 2(b)(ii).

49.     Brackbill further acknowledged and agreed that "[a]ll affiliates and subsidiaries of the Corporation have, or will as the result of a future acquisition, merger, assignment or otherwise have, an interest in your Employment and your compliance with the obligations in Section 2(d) (Competition with the Corporation Group), and that those entities are each express, third-party beneficiaries of this Agreement."  Ex. B, 9(b), Ex. C, 10(b) [reference to Section 2(b)], Ex. D, 10(b) [reference to Section 2(b)].  Employment is defined as "any period of time during

---

[1] Corporation Group is defined as the Corporation and its subsidiaries and affiliates and Corporation is defined as Johnson & Johnson, a New Jersey corporation.  *See* Ex. B, ¶¶ 1(a), 8(e), Ex. C, ¶¶ 1(a), 9(e), Ex. D, ¶¶ 1(a), 9(e).

which you are an employee of the Corporation Group."  Ex. B, ¶ 8(j); Ex. C, ¶ 9(j);

Ex. D, ¶ 9(j).

50.     JJHCS and JGS are both subsidiaries of Johnson & Johnson, both

employed Brackbill, and both have an interest in his Employment, as defined.

51.     The 2020 Noncompetition Agreement defines "Competitor" as

> any person or entity including, but not limited to, you or anyone acting
> on your behalf, that is engaged or preparing to be engaged in research,
> development, production, manufacturing, marketing or selling of, or
> consulting on, any product, process, technology, machine, invention or
> service in existence or under development that resembles, competes
> with, may now or in the future compete with, can be substituted for or
> can be marketed as a substitute for any product, process, technology,
> machine, invention, or service of the Corporation Group that is in
> existence or that is, was or is planned to be under development.

*See* Ex. B, ¶ 8(c); Ex. C, ¶ 9(c); Ex. D, ¶ 9(c).

52.     In addition, as a condition of his employment with JJHCS as well as his

access to Plaintiffs' confidential, proprietary, and trade secret information, Brackbill

signed the Employee Secrecy, Intellectual Property and Non-Solicitation Agreement

(the "2021 Employee Secrecy Agreement").   In the 2021 Employee Secrecy

Agreement, Brackbill acknowledged that his role "involves a position of trust and

confidence in which [he] will have access to confidential, proprietary, and secret

information, the disclosure of which would cause the COMPANY to suffer

substantial and irreparable harm", and further acknowledged that, if any of

Plaintiffs' "business, research, and development efforts, business and customer

21

relationships, reputation and goodwill, all of which are valuable interests," were used or diverted to benefit a competitor, Plaintiffs would suffer irreparable harm. The 2021 Employee Secrecy Agreement is attached as **Exhibit E**, preamble.

53.    Brackbill further agreed that both during and after his employment, he would not "use or disclose any CONFIDENTIAL INFORMATION, or provide any third party with access to any CONFIDENTIAL INFORMATION." Ex. E, ¶ 2.1.

54.    Brackbill further promised that, upon termination of employment with Plaintiffs, he would "return all property in [his] possession or custody belonging to any COMPANY, including any CONFIDENTIAL INFORMATION, . . . issued to [him] . . . during [his] employment" that he "shall not make or retain copies of any CONFIDENTIAL INFORMATION . . . that were entrusted to [him], created by, available to or obtained by [him] at any time during [his] employment within the COMPANY unless expressly authorized in writing.[2] *Id*. ¶ 2.4.

55.    Under the 2021 Employee Secrecy Agreement, CONFIDENTIAL INFORMATION is defined as

> …information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to [Brackbill], made available to [him], or known by [him] as a result of [his] employment with any COMPANY, including, but not limited to, the following information: product development, product

---

[2] COMPANY is defined as the Johnson & Johnson Family of Companies.

performance, product know-how, product specifications, techniques, drawings, prints, designs and tolerances; regulatory strategies, clinical trials and investigations; manufacturing, engineering, logistics, and quality systems and related processes, data and techniques; information systems, computer programs, software and hardware configurations; business, financial, operating, sales and marketing plans and strategies; inventions, ideas, discoveries, improvements, innovations and intellectual property strategies; pricing and pricing strategies, forecasts, contract and bidding details, financial data, models and analyses, customer lists, sales volume, sales data and analyses; customer, business partner and vendor relationships and arrangements; information regarding customers' needs, requirements, purchasing histories, likes, dislikes, habits, preferences, and other customer-specific information; information regarding the COMPANY'S personnel, including compensation, performance and other personnel data; human resources strategies and goals, recruitment methods and plans, training methods and procedures.

*Id*. at ¶ 2.1.

56.     Brackbill further agreed that he would not, for a period of twelve (12) months after the termination of his employment, engage in any activity which involves the solicitation or hiring of any individual employed by any COMPANY, as defined, with whom Brackbill worked or who became known to him as a result of his employment to leave their employment.  Ex. E, ¶ 3.1.

## IV.    BRACKBILL'S POSITION WITH PFIZER VIOLATES HIS NONCOMPETITION AGREEMENTS AND THREATENS J&J's HIGHLY SENSITIVE, CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION

57.     On or about July 26, 2023, Brackbill gave notice of his resignation from JJHCS, and his last day was August 7, 2023.  While initially attempting to conceal

that he was going to work for a direct competitor, Pfizer, he finally disclosed that he was going to work for Pfizer.  However, Brackbill represented to J&J that he was not working in the same therapeutic area and that he was not doing any of the same type of strategy work that he did on behalf of J&J, but rather would be responsible for contracting.

58.     In addition, as described at greater length below, on or about November 8, 2023, Brackbill again represented to J&J that, although he was working for Pfizer, he stated that he was working in a different therapeutic area, and that he was in "contracting strategy."  Brackbill further assured J&J that his Pfizer role did not involve any of the long-term planning and commercial strategy that was part of his prior SCG role.

59.     On March 4, 2024, J&J learned for the first time from Pfizer directly that Brackbill has been working in the position of Director, Contract Strategy, US Market Access.  A copy of Brackbill's Pfizer Job Description is attached hereto as **Exhibit F**.  This position is not limited in any way by therapeutic area or function as Brackbill represented to J&J.  Rather, it is a directly competitive position.

60.     Pfizer's US Market Access group performs the same function within Pfizer's organization as the SCG fulfills for J&J.  Pfizer's Market Access group is the commercial strategy organization for Pfizer's pharmaceutical business, and the group that is working directly against and competing with the SCG at J&J.

61.     In his role at Pfizer in the directly competitive Market Access group, as

Pfizer's Director of Contract Strategy, Brackbill:

   a. works directly with Pfizer's brand teams, therapeutic area leaders
      and U.S. Market Access stakeholders to lead the development and
      assessment of contracting strategies at the product and channel level
      (*e.g.* Commercial, Medicare, Medicaid, Hospital, and Specialty
      Pharmacy);

   b. conducts strategy development and channel assessments to include
      internal and external research, analytics, and financial analyses to
      develop and support recommendations; and

   c. supports Pfizer assets throughout the product lifecycles (e.g. launch,
      post-launch, LOE).

Ex. F.

62.     Brackbill's job responsibilities specifically include:

   a. "leading a cross-functional team" within the Market Access group
      and partnering with "various cross-functional stakeholders" to
      formulate Pfizer's contracting strategies from pre-launch to launch;

   b. monitoring contract, channel, and product trends to identify issues
      and provide solutions to Brand Team and Senior Leadership;

   c. collaborating with Patient and Health Impact stakeholders to
      participate in and support pre-launch activities such as market
      research studies, competitive environment evaluations, and pricing
      research studies, as well as support for licensing deals and
      development program assessments;

   d. delivering "timely, consistent contract and product strategies to
      meet competition and respond to changing and increasingly
      complex marketplace dynamics"; and

   e. active involvement in the assessment and development of value-
      based contractual agreements.

Ex. F.

63.     Thus, contrary to his representations to J&J, according to his Pfizer job description, Brackbill works in a strategic cross-functional role working with Pfizer's brand teams, therapeutic area business leaders, and the stakeholders in the Market Access group.   Just as Brackbill did with J&J, he now leads a cross-functional team to arrive at recommendations on market access strategy for Pfizer.

64.     Pfizer and J&J compete directly and head-to-head in multiple product lines, including in the Oncology and Immunology therapeutic areas.   Specifically, the competition between Pfizer and J&J is particularly fierce in the area of treatments for Oncology.

65.     The information that Brackbill had access to in his role with J&J – which included J&J's highly confidential, proprietary and trade secret channel, value access and contracting strategies and all of its customer-specific sales information – could disadvantage J&J and advantage Pfizer.

**V.     BRACKBILL'S WILLFUL, INTENTIONAL, CONTINUED ACCESS AND USE OF J&J'S HIGHLY SENSITIVE, CONFIDENTIAL, PROPRIETARY, AND TRADE SECRETS INFORMATION CONFIRMS THE IMMINENT IRREPARABLE HARM TO PLAINTIFFS**

66.     Not only did Brackbill have access to information that could advantage Pfizer and disadvantage Plaintiffs, but J&J has discovered that Brackbill secretly

stole vast amounts of confidential information, some of which he had no reason to access in the scope of his J&J employment.

67.    Brackbill exfiltrated to personal storage devices over a thousand confidential internal J&J documents, retained them in his possession after the termination of his employment, and accessed a critical sub-set of these documents during his employment with Pfizer.

68.    The information Brackbill misappropriated and wrongfully retained directly relate to his role with Pfizer and, if used or disclosed, would unfairly advantage Pfizer and irreparably disadvantage and harm Plaintiffs.   This highly confidential information includes:

    a. **J&J Business Strategies.** These documents outline J&J's 10-year-long strategic plans and the critical success and risk factors across all therapeutic areas, as well as the exact timelines of J&J's planned product launches.   The documents outline detailed analysis of specific market factors that would enable competitors to adjust their competitive strategy and undercut J&J's millions of dollars in investment into establishing a competitive advantage.   Examples include the "10 Year Brand Strategy.pptx" and the "2022 SCG Business Plan Final.pptx".

    b. **Product Launch Strategies.** These documents concern products that are set to launch in the coming years.   Disclosure of these present the greatest risks to J&J's competitive success because access to the detailed launch plans would enable a competitor to understand and effectively counter the strategic launch plans across numerous products.   An example is the "Trade Launch Tracker.pptx".

c. **Channel Strategies.** These documents include the playbooks that would enable a competitor to understand the precise situational responses, as well as specific product launch strategies, that outline the channels that J&J decide to use, or not use.  If put in the hands of a competitor, it would be able to strategically choose to compete with J&J in specific channel areas, or to take advantage of the fact that J&J is not planning to utilize other channel areas.  Examples include "Channel Strategy Playbook -2023.pdf" and "Tal Channel Strategy Reco 12.21.22.pptx".

d. **Assessment of Distributor Relationships.** This is specific information about assessment of distributor relationships, as described above in ¶ 40.  Examples include "Project Jigsaw Executive Overview Deck V2.pptx" and "DPA Strategy June Update.pptx".

e. **Market Access and Policy Assessment.** This is the market access and policy assessment described above in ¶ 35, and identifies the market and policy factors that J&J has identified as impacting its business, which form the foundation its strategic business plans. This is contained in the "Market Access and Policy Assessment_2023.pptx".

f. **Clinical Studies.** These documents outline the proprietary novel and combination medicines that J&J intends to launch in the coming years, with detailed outlines of studies, and planning and policy development around those studies. Examples include "Combo CDP [with CET] Summaries.pptx" and "Cet Internal Study List.pptx".

g. **Customer Net Purchase Overviews.**  These sets of documents include detailed overviews of customer networks across Market Access, including details on group purchasing organizations (GPOs).  Some documents include contact information and historic price changes that the company has made on products across therapeutic areas.  Examples include "2021 ROC April Price Increase.xlsx" and "1Q23 CPP GPO Pricing Field Comm.xlsx".

h. **Reports Generated from J&J Internal Dashboards and Databases, including Channel Bar and Downstream Customer Reports.**  These documents include massive Excel spreadsheets

containing data intentionally downloaded from J&J's internal databases and contain weekly product sales for a two year-period (March 2021-March 2023) across the portfolio as well as for specific products, including ERLEADA and OPSUMIT, organized by channel (i.e., specialty pharmacy providers), and containing data reflecting various measures of the Wholesale Acquisition Cost ("WAC"), the identity of the distributors, and the identity of the specific downstream customers, including address and location, to whom the sale was made. This highly confidential information can be used to back into calculations of share, rebates, discounts, and other specific pricing information that can be used to advantage a competitor.

69.     A forensic inspection of Brackbill's computer shows that, starting in September 2023, while working for Pfizer, Brackbill began to access a sub-set of J&J documents that he had copied from J&J's SCG internal files and from J&J's internal dashboard. Tellingly, just before accessing the highly confidential, proprietary information, Brackbill accessed an unsigned copy of his 2014 Noncompetition Agreement as the second document in this list, showing that Brackbill was well-aware of his obligations to Plaintiffs when he was accessing these stolen documents.

70.     Brackbill's conduct was willful, intentional, and for the purposes of competing as shown by the following chart, which is an excerpt from a longer list of documents that Brackbill accessed in chronological order in September and October 2023 while he was employed by Pfizer. The order in which the documents were accessed demonstrates that the documents were intentionally used.

| Last Accessed (ET) | File Name | Description |
|---|---|---|
| 09/21/2023 03:28:47 PM | Market Access and Policy Assessment_2023.pptx | Access and policy assessment described above in ¶¶ 35-36 |
| 09/28/2023 04:17:10 PM | Non-Compete Agreement.pdf | Copy of an unsigned 2014 Noncompetition Agreement |
| 09/28/2023 04:23:41 PM | Situational Assessment v2.pptx [entitled "Market Access Readiness Reviews (MARR) ERLEADA 2023 Situational Assessment" in the document] | Directly competitive strategic planning for J&J's ERLEADA, which competes directly with Pfizer's XTANDI described above in ¶¶ 37-38. |
| 09/28/2023 04:27:16 PM | DPA Strategy June Update v5.pptx [entitled "DPA 2024 – Market Assessment Readout – Leadership Update June 20, 2023" in the document] | Strategic review of J&J distributor relationships described above in ¶¶ 39- 40. |
| 09/28/2023 04:30:45 PM | Products-1.xlsm | List of 185 J&J products, organized by Life Cycle Stage, Product Status, and Category of medicine (i.e., small molecule) with a list of J&J personnel responsible for each product in 23 different functional areas |
| 09/28/2023 04:32:17 PM | Channel_Bar_View_Full_Data_data (3).csv | Downloaded report from J&J internal Tableau dashboard reflecting two years of gross sales by week for the entire J&J portfolio in its Specialty Pharmacy Providers channel |

| Last Accessed (ET) | File Name | Description |
|---|---|---|
| 09/28/2023 04:32:29 PM | Channel_Bar_View_Full_Data_data.csv | Downloaded report from J&J internal Tableau dashboard reflecting customer list and two years of gross sales by week for J&J's ERLEADA, which competes directly with Pfizer's XTANDI |
| 09/28/2023 04:34:53 PM | Downstream_Customers_Full_Data_data (3).csv | Downloaded report from J&J internal Tableau dashboard reflecting two years of gross sales by week for J&J's ERLEADA, which competes directly with Pfizer's XTANDI within J&J's Oncology Clinics channel |
| 09/28/2023 04:39:18 PM | Purchases by Product 2022.xlsx | Summary of gross sales across J&J's portfolio by product |
| 10/03/2023 10:31:14 AM | Downstream_Customer_Net_Purchases_Overview_Full_Da_data (1).csv | Downloaded report from J&J internal Tableau dashboard reflecting two years of gross sales by week for J&J's OPSUMIT, a pulmonary hypertension product |
| 10/03/2023 11:04:37 AM | Channel_Bar_View_Full_Data_data (4).xlsx | Downloaded report from J&J internal Tableau dashboard reflecting two years of gross sales by week for the entire J&J portfolio in its Specialty |

| Last Accessed (ET) | File Name | Description |
|---|---|---|
| | | Pharmacy Providers channel |
| 10/05/2023 10:39:58 AM | Channel Strategy Review_ KG_WIP.pptx | Strategic overview of Channel Strategy group within SCG, containing the status of products in the pipeline (both launched and pre-launch) with respect to channel strategy planning. Marked with the FOR INTERNAL USE legend referenced in ¶ 24 as well as the label "Confidential – For Internal Use Only" |
| 10/05/2023 10:43:22 AM | Digital Flow Deliver.pptx | Internal draft document from MedTech business sector reflecting planning for digital operating rooms |

71.     Brackbill accessed and used J&J's files on weekdays and during working hours at Pfizer, and they contain current, highly confidential, and sensitive SCG data and analysis that relates directly to the strategic roles and responsibilities Brackbill has in Pfizer's directly competitive Market Access group.

## VI.    BRACKBILL'S EFFORTS TO CONCEAL HIS WRONGDOING

72.     Plaintiffs have programs in place designed to detect theft and exfiltration of J&J confidential information and intellectual property.  Microsoft

Insider Risk Management ("MISRM") is one of the technologies used to support these programs. An initial alert can show when files were copied, accessed, or downloaded, the devices that were used, the individual user's information, and other identifying information that would allow a response in a following investigation.

73.   Brackbill's activity triggered an alert in MISRM. The alert showed that that between July 12 and July 14, 2023, approximately three (3) weeks before his last day of employment, Brackbill downloaded and copied several thousand files onto an external hard drive, and that the information was a mix of business and personal information.

74.   On October 25, 2023, Plaintiffs directed a letter to Brackbill putting him on notice that he may have improperly accessed, downloaded, or otherwise transferred proprietary and confidential documents and advised that, if true, such action is in violation of J&J policy and applicable written agreements and the company may take further action to protect its rights. The letter further advised that J&J was undertaking a review and investigation, and that Brackbill's cooperation would be required. The letter advised that the company would be in touch to schedule an interview.

75.   On November 8, 2023, the company's Information Security and Risk Management ("ISRM") and Employee Relations/Labor Relations ("ER/LR") representatives interviewed Brackbill as part of the investigation.

33

76.    During the interview, Brackbill was asked why he had moved so many files onto an external drive.  In response, he said that he had a variety of personal documents and information, such as tax returns, photographs, and resumes on his J&J laptop.  He said that he downloaded these personal documents after he gave his notice.  He also said that he had told his supervisor that he would be taking personal documents, and acknowledged that he was not authorized to take any business documents.

77.    Brackbill was then asked additional questions about the USB device that he had used.  He claimed that he had not copied the data to his personal computer or to cloud storage, and that he had not shared the drive with anyone or shared the data with his new employer, which he later revealed as being Pfizer.

78.    Brackbill was then asked directly whether he reviewed any of the data since he copied it, and he said that he had reviewed it in the context of having received the letter dated October 25, 2023.

79.    Brackbill was then asked about the downloading alert, which indicated that Brackbill had in fact taken J&J business documents, including confidential files related to specific products, the oncology portfolio, and other similar documents. Only then did Mr. Brackbill acknowledge that he had also downloaded business documents to the drive.

34

80.   Brackbill was also asked questions about his role at Pfizer and he represented that he was working in a position that was not competitive with his role at J&J.  Brackbill stated that he was working in a different therapeutic area, and that he was in contracting strategy.  In response to further follow up questions to clarify the differences in the role, Brackbill explained that his current role at Pfizer involves "contracting" whereas his role in J&J involved "planning."

81.   The ISRM and ER/LR representatives were concerned regarding Brackbill's transparency during the interview, finding that he was not forthcoming in the interview, only provided a minimal amount of information in response to questions, and only acknowledged additional information when specifically asked.

82.   On November 29, 2023, J&J sent letters to Brackbill and Pfizer. Brackbill's letter detailed its understanding that Brackbill likely was in breach of his ongoing post-employment obligations and asked Brackbill to provide a description of his Pfizer responsibilities.  The letter also directed Brackbill to provide various assurances, and to turn devices over for forensic inspection.  Pfizer's letter similarly expressed J&J's concerns regarding Brackbill's noncompliance with his post-employment obligations and explained that J&J was working with Brackbill to return the J&J documents that he had taken.  The letter to Pfizer requested that it conduct an investigation, to provide assurances that Brackbill had not improperly used J&J's confidential information, and to verify Brackbill's job responsibilities.

83.    Initially, Brackbill had only disclosed the existence of one (1) external drive.  However, he then turned over nine (9) devices, which included one small form factor mini-PC ("Brackbill Computer") and eight (8) external storage devices. The initial forensic inspection then identified additional unaccounted-for external devices that could contain J&J information.  Brackbill was asked to turn over the additional external devices that had been identified but remained unaccounted for. Over the next three months, Brackbill turned over additional devices for inspection.

84.    In sum, Brackbill eventually turned over a total of eighteen (18) devices for inspection, inclusive of the initial set of nine (9) devices.  Upon inspection, it was found that one of the external drives was the same storage device that Brackbill used to copy information from his J&J laptop, and that another external drive contained large amounts of J&J files that seemed to be current.  Further analysis revealed, however, that **twenty-eight (28)** total devices had been plugged into the Brackbill Computer.

85.    A forensic document access analysis was performed, which collected data from the Brackbill Computer to identify the date and time that Brackbill accessed files, as well as whether they were present on either the Brackbill Computer or any of the seventeen (17) external drives that Brackbill provided for inspection. **After multiple follow-ups and weeks of delays, on February 29, 2024, Brackbill confirmed that he would not turn over the missing devices.**

86.     The forensic reporting shows that Brackbill cannot account for all the drives that were inserted into the Brackbill Computer, including one (1) device which was plugged in to the Brackbill Computer on December 17, 2023, which was during the time when Brackbill was supposed to be gathering devices for the inspection.

87.     Plaintiffs cannot conduct a complete review and accounting, and there remains a question about the location of the files that Brackbill misappropriated from J&J.  It is possible, given Brackbill's deception and delays in turning over all devices, that there are other repositories where Brackbill may have stored this information, including his personal email account or personal cloud storage, any other laptop used, or any other device or account he was assigned by Pfizer.

88.     Based on the foregoing, it is clear and obvious that Brackbill willfully used his access to J&J's highly confidential, proprietary, and trade secret information for the purpose and intention of interfering with and having an adverse effect on J&J's business and to the advantage of Pfizer's.  Brackbill then purposefully concealed this misappropriation.

89.     Brackbill started working for Pfizer in a competitive role while in custody of over a thousand of J&J's highly confidential, proprietary, and trade secret information that he willfully and intentionally exfiltrated from J&J, that he accessed during his employment with Pfizer, that he attempted to conceal when asked, and

ultimately, as of February 29, 2024, could not account for all devices that may contain such highly confidential information for forensic review.

90.     By working for a direct competitor of J&J in his current position with Pfizer, after having had such broad and extensive access to highly sensitive information of J&J, Brackbill is in direct violation of his obligations under the 2014 Noncompetition Agreement and the 2020 Noncompetition Agreement.

91.     Plaintiffs will suffer immediate and irreparable harm unless Brackbill is enjoined from breaching his post-employment obligations.

92.     Not only did Brackbill have access to J&J's information while employed with Pfizer, which would be a sufficient basis for an injunction given his directly competitive role, but he stole information from J&J that directly relates to his role with Pfizer, and he accessed it when working in that role.

93.     There is no adequate remedy at law for the irreparable harm that Plaintiffs have suffered and will continue to suffer unless Brackbill is enjoined.

94.     Injunctive relief is necessary to restore the parties to the *status quo ante* before Brackbill began engaging in wrongful conduct.  Plaintiffs will prevail on the merits and the balancing of equities strongly favors Plaintiffs.

<u>COUNT I</u>
**Breach of Contract (2014 Noncompetition Agreement (¶¶ C.5, C.6))**

95.    Plaintiffs hereby incorporate and re-allege every allegation set forth above, which further detail Brackbill's conduct as though fully set forth herein.

96.    The 2014 Noncompetition Agreement between Brackbill and JGS is valid and enforceable and supported by adequate consideration.

97.    Pfizer is a COMPETITOR, as the term is defined in the 2014 Noncompetition Agreement. *Id.* ¶ B.

98.    As set forth in the 2014 Noncompetition Agreement as well as above, the Agreement contains a restriction on post-employment competition under which Brackbill agreed, for a period of eighteen (18) months following his employment, not to perform work for any competitor in any position in which he could disadvantage Plaintiffs or advantage a competitor by his disclosure or use of CONFIDENTIAL INFORMATION to which he had access.

99.    As further set forth in the 2014 Noncompetition Agreement, Brackbill is restricted from using or disclosing any CONFIDENTIAL INFORMATION or providing any third party with access to any CONFIDENTIAL INFORMATION, both during and subsequent to his employment with Plaintiffs.  Ex. A, ¶ C.5.

100.    Brackbill agreed not to use, disclose, disseminate, lecture upon, or publish any CONFIDENTIAL INFORMATION, as defined therein, including any

39

CONFIDENTIAL INFORMATION issued to him during his employment. *Id*. ¶ C.5.

101. Brackbill acknowledged, by executing the 2014 Noncompetition Agreement, that violation of the Agreement by providing a COMPETITOR with CONFIDENTIAL INFORMATION "will cause immediate irreparable harm" to Plaintiffs. *Id*. ¶ C.5.

102. During the last two (2) years of his employment, Brackbill had significant and extensive access to an array of confidential, proprietary, and trade secret information related to J&J's product lifecycle strategy, including pricing and contracting strategy that are central to his role at Pfizer.

103. Following his resignation, Brackbill commenced employment with J&J's direct competitor, Pfizer, in a directly competitive role, and in which his use of J&J's highly confidential information advantages Pfizer and disadvantages Plaintiffs.

104. In advance of and during his Pfizer employment, Brackbill improperly retained, accessed, and used J&J's highly confidential business and trade secret information that directly relates to his Pfizer's job responsibilities.

105. Brackbill has breached, and threatens to continue to breach, the above-referenced 2014 Noncompetition Agreement, as described in the foregoing paragraphs.

106.   As a result of his unlawful activities, Brackbill has unlawfully advantaged Pfizer and disadvantaged Plaintiffs by retaining, using, and accessing J&J's confidential and trade secret information.

107.   Brackbill's actual and/or prospective breaches of the 2014 Noncompetition Agreement has caused, and will continue to cause, immediate and irreparable harm to Plaintiffs.

108.   Plaintiffs have no adequate remedy at law to fully compensate them for the harm caused by Brackbill's unlawful conduct and will continue to suffer substantial and immediate irreparable harm unless he is enjoined as set forth below.

<u>**COUNT II**</u>
**Breach of Contract (the 2020 Noncompetition Agreement)**

109.   Plaintiffs hereby incorporate and re-allege every allegation set forth above, which further detail Brackbill's conduct as though fully set forth herein.

110.   During his employment, Brackbill received three (3) award agreements under Johnson & Johnson's long-term incentive plan that contain post-employment restrictions on competition: the 2020 LTI Agreement, the 2019 LTI Agreement, and the 2018 LTI Agreement.

111.   Each of the LTI Agreements contains a restriction on post-employment competition under which Brackbill agreed, for a period of eighteen (18) months following his employment, not to perform work for any competitor in any position

in which he could disadvantage Plaintiffs or by his disclosure or use of confidential information to which he had access.

112.   Brackbill further acknowledged and agreed that "[a]ll affiliates and subsidiaries of the Corporation have, or will as the result of a future acquisition, merger, assignment or otherwise have, an interest in your Employment and your compliance with the obligations in Section 2(d) (Competition with the Corporation Group), and that those entities are each express, third-party beneficiaries of this Agreement."  Ex. B, 9(b), Ex. C, 10(b) [reference to Section 2(b)], Ex. D, 10(b) [reference to Section 2(b)].

113.   Brackbill's respective employment with the Plaintiffs is "Employment" as that term is defined in the 2020 Noncompetition Agreement.

114.   JJHCS and JGS are both subsidiaries of Johnson & Johnson, both employed Brackbill, and both have an interest in his Employment, as defined in the 2020 Noncompetition Agreement.

115.   Pfizer is a Competitor, as the term is defined in the 2020 Noncompetition Agreement.

116.   As detailed herein, Brackbill had significant and extensive access to a broad array of highly confidential, proprietary, and trade secret information concerning the competitive strategies for J&J's business.

117.   Following his resignation, Brackbill commenced employment with J&J's direct competitor, Pfizer, in a directly competitive role, and in which his use of J&J's confidential information advantages Pfizer and disadvantages Plaintiffs.

118.   In advance of and during his Pfizer employment, Brackbill improperly retained, accessed, and used J&J's highly confidential business and trade secret information that directly relates to his Pfizer's job responsibilities.

119.   Brackbill has breached, and threatens to continue to breach, the above-referenced 2020 Noncompetition Agreement as described in the foregoing paragraphs.

120.   Brackbill's actual and/or prospective breaches of the Noncompetition Agreements has caused, and will continue to cause, immediate and irreparable harm to Plaintiffs.

121.   Plaintiffs have no adequate remedy at law to fully compensate them for the harm caused by Brackbill's unlawful conduct and will continue to suffer substantial and immediate irreparable harm unless he is enjoined as set forth below.

## <u>COUNT III</u>
### Breach of Contract (2021 Employee Secrecy Agreement (¶¶ 2.3, 2.4))

122.   Plaintiffs hereby incorporate and re-allege every allegation set forth above, which further detail Brackbill's conduct as though fully set forth herein.

123.   The 2021 Employee Secrecy Agreement between Brackbill and JJHCS is valid and enforceable and supported by adequate consideration.

124.   As set forth in the 2021 Employee Secrecy Agreement, Brackbill is restricted from using or disclosing any Confidential Information, or providing any third party with access to any Confidential Information, both during and subsequent to his employment with Plaintiff.

125.   Brackbill agreed to return all J&J property in his possession or custody, including any Confidential Information issued to him during his employment.

126.   Brackbill agreed not to make or retain copies of any Confidential Information or any documents relating in any way to the business of any Company entrusted to him at any time during his employment within the Company.

127.   Brackbill acknowledged, by executing the 2021 Employee Secrecy Agreement, that violation of the Agreement "will cause irreparable harm".  Ex. E, preamble.

128.   Brackbill has breached, and threatens to continue to breach, the above-referenced restrictions on his use of Confidential Information pursuant to provisions of the 2021 Employee Secrecy Agreement as described in the foregoing paragraphs.

129.   Unless enjoined, upon information and belief, Brackbill will breach and/or continue to breach the restriction on use of confidential information and trade secrets under the 2021 Employee Secrecy Agreement by continuing to use, directly

44

and indirectly, Plaintiffs' confidential information, to the benefit of his current employer, Pfizer.

130.   Brackbill's actual and/or prospective breaches of the 2021 Employee Secrecy Agreement have caused, and will continue to cause, immediate and irreparable harm to Plaintiffs.

131.   Plaintiffs have no adequate remedy at law to fully compensate them for the harm caused by Brackbill's unlawful conduct and will continue to suffer substantial and immediate irreparable harm unless he is enjoined as set forth below.

## COUNT IV
### Violation of Defend Trade Secrets Act (18 U.S.C. § 1836 et seq.)

132.   Plaintiffs hereby incorporate and re-allege every allegation set forth above, which further detail Brackbill's conduct as though fully set forth herein.

133.   Plaintiffs own and possess certain highly confidential, proprietary, and trade secret information detailed above, including market access and policy assessments, specific market access readiness reviews, strategic review of distributor relationships, J&J business strategies, product launch strategies, channel strategies, including pricing and contracting, information concerning clinical studies, customer net overviews, internal specialized training and education, and the detailed internal data underlying all of the analysis and strategies (the "Trade Secrets").

134.   Plaintiffs have taken reasonable measures to keep such information secret, including by requiring parties with access to this information to sign confidentiality agreements, by storing this information in physically secure buildings, by requiring validly-issued logins with passwords to log in to access J&J's electronic information, and by providing warnings, legends, and labels on documents and in information systems to warn the user that they will be accessing valuable confidential information.  Plaintiffs also have programs in place designed to detect the theft and exfiltration of confidential information and intellectual property, which detected Brackbill's unlawful activity.

135.   Plaintiffs' proprietary, trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

136.   Brackbill willfully and intentionally copied to a personal storage device over a thousand documents containing J&J Trade Secrets mere weeks before resignation from his employment with JJHCS and with a plan to commence employment with its direct competitor.

137.   Brackbill was in possession of documents that contain Trade Secrets while he was employed in a competitive position with Pfizer, a direct competitor. Disclosure of the Trade Secrets to Pfizer by executing his job responsibilities is not

only inevitable but is now likely, because forensic review confirmed that Brackbill accessed and used such documents during his employment with Pfizer.

138.   As a direct and proximate result of Brackbill's conduct, Plaintiffs have suffered and, if Brackbill's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.   Because Plaintiffs' remedy at law is inadequate, they seek, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.   Plaintiffs' business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## <u>COUNT V</u>
### Violation of the New Jersey Trade Secrets Act (N.J.S.A. 56:15-2)

139.   Plaintiffs hereby incorporate and re-allege every allegation set forth above, which further detail Brackbill's conduct as though fully set forth herein.

140.   Plaintiffs own and possess the Trade Secrets, including information about market access and policy assessments, specific market access readiness reviews, strategic review of distributor relationships, J&J business strategies, product launch strategies, channel strategies, including pricing and contracting, information concerning clinical studies, customer net overviews, and the detailed

internal data underlying all of the analysis and strategies which are trade secrets, as defined under N.J.S.A. 56:15-2.

141.   Plaintiffs have taken reasonable measures to keep such information secret and confidential, including by requiring parties with access to this information to sign confidentiality agreements, by storing this information in physically secure buildings, by requiring validly-issued logins with passwords to log in to access J&J's electronic information, and by providing warnings, legends, and labels on documents and in information systems to warn the user that they will be accessing valuable confidential information.  Plaintiffs also have programs in place designed to detect the theft and exfiltration of confidential information and intellectual property.

142.   Plaintiffs' proprietary, trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

143.   Brackbill willfully and intentionally copied to his personal device over a thousand documents containing J&J Trade Secrets mere weeks before resignation from his employment with JJHCS and with a plan to commence employment with a direct competitor.

144.    Brackbill was in possession of J&J files that contain trade secrets while he was employed in a directly competitive position with Pfizer, a direct competitor. Disclosure of those trade secrets to Pfizer by executing his job responsibilities is not only inevitable but now likely, because forensic review confirmed that Brackbill accessed and used such documents during his employment with Pfizer.

145.    As a direct and proximate result of Brackbill's conduct, Plaintiffs have suffered and, if Brackbill's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Plaintiffs' remedy at law is inadequate, they seek, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Plaintiffs' business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## COUNT VI
### Misappropriation

146.    Plaintiffs hereby incorporate and re-allege every allegation set forth above, which further detail Brackbill's conduct as though fully set forth herein.

147.    Plaintiffs own and possess the Trade Secrets, including information about market access and policy assessments, specific market access readiness reviews, strategic review of distributor relationships, J&J business strategies,

product launch strategies, channel strategies, including pricing and contracting, information concerning clinical studies, customer net overviews, and detailed internal data underlying all of the analysis and strategies.

148.   Plaintiffs have taken reasonable measures to keep such information secret and confidential, including by requiring parties with access to this information to sign confidentiality agreements, by storing this information in physically secure building, by requiring validly-issued logins with passwords to log in to access J&J's electronic information, and by providing warnings, legends, and labels on documents and in information systems to warn the user that they will be accessing valuable confidential information.   Plaintiffs also have programs in place designed to detect the theft and exfiltration of confidential information and intellectual property, which detected Brackbill's unlawful activity.

149.   Plaintiffs' proprietary, trade secret information derives independent economic value from no being generally known to, and not be readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of this information.

150.   Brackbill willfully and intentionally copied to his personal device over a thousand documents containing J&J Trade Secrets mere weeks before resigning from his employment with JJHCS and with a plan to commence employment with its direct competitor.

151.   Brackbill was in possession of J&J files that contain Trade Secrets while he was employed in a directly competitive position with Pfizer, a direct competitor. Disclosure of the Trade Secrets to Pfizer by executing his job responsibilities is not only inevitable but now likely, because forensic review confirmed that Brackbill accessed and used such documents during his employment with Pfizer.

152.   As a direct and proximate result of Brackbill's conduct, Plaintiffs have suffered and, if Brackbill's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.   Because Plaintiffs' remedy at law is inadequate, they seek, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Plaintiffs' business operates in a competitive market and will continue to suffer irreparable harm absent injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and against Brackbill, and respectfully request the following relief:

A.    An order enforcing the terms of Brackbill's 2014 and 2020 Noncompetition Agreements, including an injunction prohibiting Brackbill form directly or indirectly performing work for Pfizer for a

period of eighteen (18) months in any position in which he could disadvantage Plaintiffs or advantage Pfizer or any other competitor of the companies by the disclosure or use of confidential information to which he had access while employed with the Plaintiffs, including, without limitation, any position involving or with access to Pfizer's Market Access group, to be extended from the date of Brackbill's last breach;

B.    An order prohibiting Brackbill from possessing, using, disclosing, or transmitting any of Plaintiffs' confidential or trade secret information;

C.    An order requiring Brackbill to account for and immediately return all documents, records, and materials containing or reflecting such confidential and trade secret information, and all copies thereof;

D.    An order requiring Brackbill to submit all of his devices and accounts to forensic examination to ensure that Plaintiffs' confidential information does not exist on Brackbill's personal or work computers, smartphones, devices, email accounts, cloud storage services, or other repositories of electronic information;

E.    Actual compensatory damages as a result of Defendant's conduct including without limitation the costs of forensic review;

F.    Incidental and consequential damages as permitted by law;

G.   Punitive damages to punish Defendant for his willful and malicious conduct;

H.   Equitable relief in the form of an accounting and/or constructive trust;

I.   Relief in the amount Defendant has been unjustly enriched including without limitation the value of long-term incentives improperly gained while in violation of his agreements with the company;

J.   Compensatory damages in an amount to be determined at trial;

K.   Permanent injunctive relief;

L.   Attorneys' fees and costs of suit; and

M.   Such other and further relief as the Court deems just and reasonable.

Dated:  March 18, 2024                    Respectfully submitted,

**BLANK ROME**
*A Pennsylvania LLP*

*/s/.    Leigh Ann Buziak*
LEIGH ANN BUZIAK (NJ ID 035052004)
STEPHEN M. ORLOFSKY (NJ ID 012431974)
New Jersey Resident Partners
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Phone: (609) 750-2646
Fax: (609) 897-7286
Stephen.Orlofsky@BlankRome.com
LeighAnn.Buziak@BlankRome.com

ANTHONY B. HALLER (*pro hac vice forthcoming*)
One Logan Square
130 North 18th Street

53

Philadelphia, PA 19103
Telephone: (215) 569-5386
Anthony.Haller@BlankRome.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 11.2</u>

Pursuant to Local Rule 11.2, counsel for Plaintiffs hereby certifies that, to the best of their knowledge, that the matter in controversy is not the subject of any other action currently pending in any court.  I declare under penalty of perjury that the foregoing statements made by me are true.

Dated:  March 18, 2024

Respectfully submitted,

**BLANK ROME**
*A Pennsylvania LLP*

/s/ Leigh Ann Buziak
LEIGH ANN BUZIAK (NJ ID 035052004)
STEPHEN M. ORLOFSKY (NJ ID 012431974)
New Jersey Resident Partners
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Phone: (609) 750-2646
Fax: (609) 897-7286
Stephen.Orlofsky@BlankRome.com
LeighAnn.Buziak@BlankRome.com

ANTHONY B. HALLER (*pro hac vice forthcoming*)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5386
Anthony.Haller@BlankRome.com

*Attorneys for Plaintiffs*